**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

JASON MELENDEZ,                                             **COMPLAINT**

                                    Plaintiffs,               **JURY TRIAL DEMANDED**

        -against-                                            Index No.

THE CITY OF NEW YORK,
CHIEF JOSEPH FOX,
CAPTAIN DONOHUE FNU,
LIEUTENANT KEITH SINGER,
DETECTIVE ALEXANDER SEPULVEDA,
ADA JUDITH LEWIS,
ADA ALYSSA GUNTHER,
ADA WILLIAM MAHONEY,

                                    Defendants.
_____

## COMPLAINT

        Plaintiff by his attorney Gregory G. Smith, Esq. complaining of Defendant CITY

OF NEW YORK alleges:

## PRELIMINARY STATEMENT

        1.      This is a civil rights action against the City of New York ("City") based on

and arising out of the wrongful acts and omissions of the New York City Police

Department ("Police Department or NYPD") and the New York County District

Attorney's Office ("District Attorney's Office or DANY") and certain employees and

agents of these offices, and against named individual employees and agents of these

offices, in which the plaintiff seeks relief for the violation of his rights secured by the

Civil Rights Act of 1866 and 1871, 42 U.S.C. Sections 1981, 1983 and 1985, of his rights

secured by the First, Fourth, Sixth, Ninth, and Fourteenth Amendments to the United

States Constitution, and of his rights secured under the laws and Constitution of the State of New York.

2.      Plaintiff seeks damages, both compensatory and punitive, an award of costs and attorneys' fees, and such other and further relief as this court deems just and proper, for having been unlawfully arrested, indicted and prosecuted for a crime(s) that plaintiff did not commit.

3.      The grounds for this action arise out of wrongful, unlawful, and improper acts of these defendants, including without limitation, falsely believing the excuses and statements of two confessed criminals who attacked plaintiff, suppression and concealment of exculpatory evidence and conspiracy to suppress and conceal exculpatory evidence, intentionally not notifying plaintiff of a grand jury presentation against him of which he was a witness and conspiracy not to notify the plaintiff of the grand jury presentation against him of which he was a witness, malicious prosecution, intentional infliction of emotional distress, and interference with plaintiff's right to contract for employment.

## JURISDICTION

4.      Jurisdiction of this court is invoked pursuant to 28 U.S.C. Section 1331; 28 U.S.C. Section 1343; 42 U.S.C. Sections 1981, 1983, 1985, 1988 and the First, Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitution and pursuant to Article 1, §§ 1, 6, 11 and 12 of the Constitution of the State of New York. The amount in controversy exceeds $10,000.

5.      Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to hear and decide claims arising under the state law that

are so related to claims in this action within the original jurisdiction of this Court and that form part of the same case or controversy.

## VENUE

6.     Venue is proper for the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 (b) because the Defendant does business and is located within the Southern District of New York and because all or a substantial part of the acts or omissions giving rise to plaintiffs' claims occurred within the Southern District of New York.

## PARTIES

7.     Plaintiff, JASON MELENDEZ, hereinafter ("plaintiff" or "Melendez") white Hispanic male age 21 at the time of the assault and attempted robbery reported herein resides in the Bronx, New York, and is a citizen of the United States. At all relevant times Plaintiff was employed by Gander & White Shipping, Inc., in Long Island City, New York as a shipping clerk.

8.     At all times hereinafter mentioned defendant CITY OF NEW YORK was a municipal corporation organized and existing under and by virtue of the laws of the State of New York. Under the Charter of the City of New York, the City is responsible for the conduct of municipal agencies such as the New York City Police Department hereinafter ("NYPD or Police Department") and the New York County District Attorney's Office hereinafter ("DANY or District Attorney's Office").

9.     At all times hereinafter mentioned the NEW YORK CITY POLICE DEPARTMENT was, and is a municipal agency of the CITY OF NEW YORK and was charged with the responsibility of enhancing the quality of life in New York City by working in accordance with constitutional rights to enforce the law.

-3-

10.     Defendant FORMER OR CURRENT CHIEF OF THE TRANSIT BUREAU JOSEPH FOX was at all times relevant herein an officer, employee, and agent of the NEW YORK CITY POLICE DEPARTMENT. He is sued in his individual and official capacity.

11.      Defendant FORMER OR CURRENT MANHATTAN HIGH ALERT CAPTAIN DONOHUE FNU was at all times relevant herein an officer, employee, and agent of the NEW YORK CITY POLICE DEPARTMENT. He is sued in his individual and official capacity.

12.     Defendant FORMER OR CURRENT NEW YORK CITY POLICE LIEUTENANT KEITH SINGER was at all times relevant herein an officer, employee, and agent of the NEW YORK CITY POLICE DEPARTMENT. He is sued here in his individual and official capacity.

13.     Defendant FORMER OR CURRENT NEW YORK CITY POLICE DETECTIVE ALEXANDER SEPULVEDA was at all times relevant herein an officer, employee, and agent of the NEW YORK CITY POLICE DEPARTMENT. He is sued in his individual and official capacity.

14.     The CITY OF NEW YORK was also, at all times relevant herein, authorized to act through the NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE in regard to investigation, evaluation and prosecution of alleged criminal conduct within the County and City of New York.

15.     The NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE a/k/a ("DANY") was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within the County and City of New York.

16.     Although not a named party, NEW YORK COUNTY DISTRICT ATTORNEY CYRUS R. VANCE, JR. was at all times relevant herein the District Attorney of the County of New York, responsible for, and the chief architect of, the policies, practices and customs of the NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE, as well as responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the assistant district attorneys who work(ed) in his office.

17.     Defendants FORMER and CURRENT ASSISTANT DISTRICT ATTORNEYS WILLIAM MAHONEY, JUDITH LEWIS and ALYSSA GUNTHER were at all times relevant herein, officers, employees and agents of the NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE. They are sued in their individual capacities.

18.     At all times relevant herein, the individual defendants and those other persons were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees, and officers of either the NEW YORK CITY POLICE DEPARTMENT or the NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE and otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

## ADMINISTRATIVE PROCEEDINGS

19.     On December 18, 2014, within ninety days after the claims arose, plaintiff caused a Notice of Claim, in proper form, to be duly filed with the Comptroller's Office and 30 days has passed and the claim has not been paid or adjusted. This action is brought within one year and ninety (90) days limitation of time applicable to state law claims against the City of New York.

## STATEMENT OF CLAIM

20.     Upon information and belief, the source of which is conversations with the plaintiff herein and review of police records and court documents, on June 10, 2010 at approximately 10:50 p.m. inside of Grand Central Terminal located at East 42nd Street and Lexington Avenue in the City, County and State of New York plaintiff was standing on the uptown platform waiting for the #5 train to arrive. At this time two male black assailants, later known as, Jovan Haulsey age 24 and Jordan Lake age 19 approached plaintiff with intent to forcibly take/rob plaintiff of his new Android smart phone.

21.     One of the assailants attempted to rob him of his cell phone, when plaintiff resisted by placing his cell phone back into his pocket the assailant began to punch him.

22.     Plaintiff attempted to defend himself and his property by pulling out his company issued box cutter, that he used for work, the assailant grabbed at it and was cut by the blade. Both assailants then overpowered plaintiff by kicking and punching him about his head and body.  Assailants yoked plaintiff up in a headlock choke hold, and after plaintiff passed out unconscious one or both of the assailants took the box cutter that was laying on the platform and slashed plaintiff's face with it, then dropped the box cutter on the platform, and left the scene of the crime because subway transit workers were rushing to the scene.

23.     A portion of the violent assault upon plaintiff was captured on video tape and 911 audio tape recordings. The video shows plaintiff being beaten, pummeled, punched, kicked, tossed and dragged by two male black assailants on the Grand Central Station Northbound subway platform as a train is entering the station.

24.      When plaintiff regained consciousness on the Northbound subway platform, his face was bleeding profusely. He boarded a Northbound subway train

assisted by concerned citizens and subway transit workers and was intercepted by Police Officers and Emergency Medical Service ("EMS") workers at the 59th Street Subway Station. Plaintiff was taken by EMS ambulance to New York Presbyterian Weil Cornell Medical Center for care and treatment.

25.     The two assailants were apprehended at Mount Sinai Medical Center where one of them was being treated for cut wounds. Both were arrested and made admissions to detectives about their role in the robbery/assault. The assailants never mentioned that they attempted to forcibly take plaintiff's cell phone from him. However, they admitted that they beat, kicked and slashed plaintiff's face. Jordan Lake took responsibility for slashing plaintiff's face. The assailants falsely alleged that they were defending themselves because plaintiff pulled out a knife and cut Jovan Haulsey.

26.     A review of the People's Voluntary Disclosure Form hereinafter ("VDF") indicates that on June 11, 2010 Jordan Lake was shown a photo array containing an image of plaintiff and mis-identified plaintiff.

27.     On June 25, 2010 at approximately 8:20 p.m. at 34 ½ East 12th Street Jovan Haulsey was shown a photo array containing an image of plaintiff and no identification was made.

28.     However, according to the VDF for plaintiff's arrest and prosecution dated April 1, 2011, executed by ADA Alyssa Gunther female white of Trial Bureau 60, and turned over to assigned defense attorney Leslie Jones Thomas, she stated that plaintiff was identified by one witness on June 25, 2011 at approximately 8:20 p.m. at 34 ½ East 12th Street in direct contradiction to the statement above and in deliberate indifference to the protected civil and constitutional rights of plaintiff to be secure in his person and free from unjust criminal accusation.

29.     Upon information and belief, ADA Lewis and Gunther female white had discussed the mis-identification with Det. Sepulveda male Hispanic white and they agreed and conspired together that there was an identification made of plaintiff by one of the assailants in deliberate indifference to the protected civil and constitutional rights of plaintiff male Hispanic white to be secure in his person and free from unjust criminal accusation.

30.     According to police reports, Lieutenant Singer male white and investigating Detectives Sepulveda male Hispanic white and Vargas were among the officers who visited and interviewed plaintiff in the hospital and took his contact and pedigree information.

31.     According to police paperwork P.O. Adonis Long was the arresting officer for the two male perpetrators.

32.     According to the Peoples' VDF, on June 11, 2010 at approximately 12:15 a.m. at Cornell Hospital upon questioning, plaintiff made the following statement to Detective Alexander Sepulveda:

> I HAD A FEW DRINKS WITH CO-WORKERS AT LA FAMILIA LOCATED AT 45 COURTHOUSE, LONG ISLAND CITY QUEENS. I TOOK THE 7 TRAIN AND SWITCHED AT EAST 42ND STREET GRAND CENTRAL. I TOOK OUT MY CELL PHONE. A SHORT BLACK MALE ASKED FOR MY PHONE. I PUT MY PHONE BACK IN MY POCKET. THE SHORT MALE AND A TALLER MALE STARTED TO PUNCH ME. I PULLED OUT A BOX CUTTER TO DEFEND MYSELF AND WAS CHOKED BY THE TALLER MALE AND BLACKED OUT. WHEN I WOKE UP I WAS COVERED IN BLOOD AND BOARDED THE FIRST EXPRESS TRAIN. I GOT OFF THE TRAIN BECAUSE I FELT DIZZY. I WORK FOR ANTIQUE SHIPPING COMPANY IN LONG ISLAND CITY AND THAT IS WHY I HAVE THE KNIFE.

33.     Throughout the police paperwork, including, but not limited to, the police complaint report, the arrest report, the handwritten arrest worksheet, and the supervisors write-up the perpetrators commanded plaintiff to "give me your phone" hence, it was clear that the two perpetrators had attempted to rob plaintiff of his cell phone and that plaintiff attempted to act in self-defense after he was assaulted by being repeatedly kicked and punched by the two perpetrators.

34.     Another example, but not the sole example of defendants deliberate indifference to plaintiff's protected civil and constitutional rights is where Lieutenant Keith Singer male white stated in his typed June 10, 2010 report to the Chief of the Transit Bureau at the NYPD that Plaintiff's attempted robbery/slashing was ["not likely"] at 42nd Street and Lexington Avenue in the confines of Transit District Four.

35.     Accordingly, a fair reading and interpretation of Lt. Singer's statement was that it was "not likely" that plaintiff's face was slashed because of an attempted robbery; thereby, negating everything that plaintiff told police when they interviewed him at his bedside.

36.     Lieutenant Keith Singer's June 10, 2010 robbery/assault report was given to Transit Bureau Chief Joseph Fox male white for review and approval and said report was approved and ratified by defendant Chief Fox.

37.     Lieutenant Singer's June 10, 2010 robbery/assault report was shared with District Attorney New York County hereinafter ("DANY") prosecutors, and in particular, with ADA Judith Lewis.

38.     It was reckless and unreasonable for the police and district attorney defendants not to believe that plaintiff was the victim of an attempted robbery because defendants had in their possession: plaintiff's statement of the occurrence, the admissions

of the two assailants, where they admit to the assault, but not to the attempted robbery, thereby minimizing their unlawful conduct and guilty knowledge by minimizing their involvement in the crime against plaintiff. Furthermore, the defendants were also in possession of an eye-witness video recording of the incident. Police had access and opportunity to interview numerous eye witnesses who saw that plaintiff was the victim and not the attacker.

39.     Upon information and belief, the source of which is conversations with plaintiff, defense attorney Leslie Jones Thomas and a review of police paperwork and documents kept by DANY, but for defendants, including, but not limited to, DANY defendants and NYPD defendants not notifying plaintiff of a pending grand jury investigation into the events of June 10, 2010, there would be no probable cause for plaintiff's arrest and prosecution.

40.     As another example, but not the sole example, of deliberate indifference to plaintiff's protected civil and constitutional rights to due process, is when Trial Bureau 60 Chief William Mahoney male white approved the prosecution and grand jury presentment of the case against plaintiff without plaintiff's knowledge and opportunity to be heard before the grand jury.

41.     ADA Judith Lewis female white discussed the case against plaintiff with Detective Sepulveda, and with her supervisor Bureau Chief William Mahoney. They discussed that the assault case as alleged by the two assailants against the plaintiff would be presented to the grand jury and that plaintiff would not be notified of the grand jury presentation, so that plaintiff would not have an opportunity to defend himself before the grand jury, and, thus be indicted for a crime(s) that he did not commit.

42.     All defendants acted intentionally, recklessly and with deliberate indifference to plaintiff's protected civil and constitutional rights.

43.     Further evidence of the DANY defendants intentional and deliberate indifference to plaintiff's protected constitutional rights is where defendants acted against their own investigative rules, policies and procedures whether verbal or written, when defendants decided not to further investigate the assault case against plaintiff, to disregard plaintiff's statement to police investigators, and to present the assault case against plaintiff to the grand jury without notifying plaintiff.

44.     The facts and circumstances of this case strongly indicate that all DANY defendants had reason to know, and did know, that there was no probable cause to indict plaintiff absent his sworn testimony before the grand jury.

45.     As another example, but not the sole example, of all defendants' deliberate indifference to plaintiff's protected civil and constitutional rights to be free from unlawful search and seizure and due process rights violations is where the decision not to notify plaintiff of the grand jury proceeding was due in part, or in whole, to the fact that the plaintiff was a young white male of Hispanic-American/Puerto Rican descent and the two assailants were two young black males of African American descent in direct violation of United States Code Section 1981.

46.     Plaintiff was left disfigured by a long scar down his face that was exacerbated because the New York County District Attorney's Office did not timely respond to request from the hospital for victim information and causation because DANY defendants recklessly believed that plaintiff, was in fact, a defendant. The delay prevented hospital doctors from doing optimal work to repair the slash to plaintiff's face.

47.     Assailants Jovan Haulsey and Jordan Lake were both indicted for attempted assault in the first degree and assault in the second degree. Each of them made statements about the occurrence, they were prosecuted, pled guilty and promised a lenient sentence under Indictment number 4109-2010 secured on or about August 13, 2010 and Criminal Court Complaint numbers: 2010NY044064 and 2010NY044063 respectively.

48.     Unbeknownst to plaintiff, on or about August 13, 2010, the New York County District Attorney's Office by defendant Judith Lewis presented a cross complaint case against plaintiff to the Grand Jury accusing plaintiff of attempted assault in the first degree and assault in the second degree and secured an indictment for the same charges. The indictment is known as an IBNA or ("N.A.") indictment. According to Court records, the case against plaintiff was presented to the Grand Jury by Assistant District Attorney Judith Lewis from Trial Bureau 60 and the indictment was secured by her.

49.     Accordingly, on or about August 13, 2010 an arrest warrant was generated pursuant to the N.A. indictment for plaintiff. Neither the District Attorney's Squad nor the NYPD served the plaintiff with the arrest warrant, although each agency had plaintiff's complete contact information, including, but not limited to, his name, address, telephone number, and alternate contact information, and other personal information about him.  The arrest warrant listed plaintiff's address as 350 St. Anns Avenue, Apt. 6U, Bronx, New York 10454.  However, no police officers, detectives, members of the District Attorney's Squad or District Attorneys ever notified plaintiff to surrender in connection with the indictment.

50.     Hence, plaintiff was never given an opportunity to testify before the grand jury to assert his innocence, to state the facts and circumstances surrounding the attack upon himself by Jovan Haulsey and Jordan Lake nor the fact that he was attempting to defend himself and his property. Police never bothered to visit plaintiff by telephone or in

person after he was released from the hospital to follow-up on his physical condition and
to obtain any additional occurrence information.

51.     As a direct and proximate cause of the District Attorney's Office and the
NYPD's culpable and deliberate reckless indifference and lack of training, plaintiff had
to endure multiple arrests, detainments, prosecutions, lack of speedy trial and severe
mental and emotional trauma.

52.     One instance, but not the sole instance of plaintiff's unlawful detainment
occurred in or about January 2011, approximately six months after the issuance of the
arrest warrant, plaintiff travelled toward the 59th Street Bridge on the Queens side in his
Gander & White (art shipping company) truck. There police officers stopped him at the
police check point and asked him to produce his driver's license and company
registration papers. The police issued him a ticket for travelling off his truck route. Next
the police notified him that he had an outstanding arrest warrant. Police did not give
plaintiff any information regarding the warrant, and they did not arrest him.

53.     Another instance, but not the sole instance of plaintiff's unlawful arrest
and detention occurred on or about September 2, 2011 at approximately 7:00 to 7:30 p.m.
when plaintiff returned to the Bronx from work. Plaintiff entered a corner bodega store,
located on East 138th Street and St. Anns Avenue to buy something. Plaintiff was
followed into the store by plainclothes police officers. The police officers asked plaintiff
if he had anything in his backpack.

54.     Plaintiff permitted the police officers to search his backpack where they
retrieved two (2) box cutters from his backpack. Plaintiff explained to the officers that he
worked for Gander & White, an art shipping company, and he used the box cutters for
packing and shipping the various materials.

55.    The police officers advised plaintiff that it was a crime to possess box cutters and placed him under arrest. Plaintiff was taken to Bronx Central Booking and then to Bronx Criminal Court. He was arraigned that night before Judge Joseph Capella. The People offered plaintiff a plea to disorderly conduct. Plaintiff pled guilty to disorderly conduct and was released on his own recognizance. The case was adjourned until November 2, 2011 for plaintiff to pay the required mandatory surcharges (surcharge and crime victim assistance fee). However, plaintiff was remanded into custody due to the New York County warrant that again popped up.

56.    The police officers then took plaintiff to the 40th police precinct in the Bronx where he was held overnight. The next morning he was transported to Manhattan Central Booking, where he was placed in a separate room. Two police officers then took him to the Criminal Court Building located at 100 Centre Street where he was held on the arrest warrant.

57.    After being held at 100 Centre Street for several hours, he was advised by the police officers that he had been arrested by mistake. Plaintiff was told that he was the wrong Jason Melendez. Plaintiff was told that the Jason Melendez that the warrant was for was that of a Hispanic male with shorter hair and who was older. The police officers uncuffed him, contacted the 40th precinct and released him. Plaintiff had been in custody for approximately 24 hours at the time of his release.

58.    In November, 2011, plaintiff appeared in Queens Traffic Court to answer the summons. The officer who issued the summons also appeared in court. After hearing plaintiff's account of what happened in January 2011, the presiding Judge dismissed that traffic summons.

59.     Another instance, but not the sole instance of unlawful detainment occurred in or about the Spring of 2013. Plaintiff was assigned to take and install an international shipment of art work in Paris, France. Plaintiff departed from JFK Airport on February 19, 2013 and returned to New York City through JFK Airport on March 7, 2013 at approximately 6:00 p.m. As plaintiff was going through U.S. Customs, he was separated from other passengers by Transportation Security Administration, hereinafter ("TSA") officers.

60.     Plaintiff was taken into a separate room and informed by a TSA employee that there was a warrant out for his arrest. The TSA employees began calling the New York County Courts in an attempt to ascertain the nature of the warrant that had popped up. Plaintiff was detained for one and half (1½) hours while TSA attempted to obtain information about the warrant. TSA employees could not obtain any information from the courts regarding plaintiff and as a result, TSA employees released plaintiff.

61.     Another instance, but not the sole instance, of the unlawful detainment of plaintiff occurred on June 27, 2013, when plaintiff and two Gander & White employee co-workers were dispatched to a customer job in Kent Connecticut. While driving upstate on the New York State Thruway, in the company truck, plaintiff was pulled over by a state trooper. When plaintiff produced his license and company truck registration, the trooper told him that he had forgotten to stop at the truck weigh station.

62.     When the state trooper checked his license, he returned and told him that there was an arrest warrant for his arrest. The Trooper issued him a warning about the weight station and took plaintiff to his barracks. Plaintiff was held for four hours at the state police barracks.

63.     Eventually, the town police drove plaintiff to a Bronx police precinct. Plaintiff was held overnight in the Bronx. Plaintiff was eventually transported down to New York County Supreme Court where on June 28, 2013 plaintiff was involuntarily returned on a warrant in New York County Supreme Court, Part 1 before the Honorable Judge Larry Stephens.

64.     Plaintiff's case was reassigned by ADA Mahoney to ADA Gunther for further prosecution. ADA Gunther was briefed on the case by ADA Lewis and/or ADA Mahoney. ADA Gunther had reason to know and did know of the weaknesses of this case, including, but not limited to, the false and minimized statements of the two assailants, the suppressed non-identification of plaintiff, the exculpatory evidence, including the plaintiff's statement, the fact that plaintiff was never notified of the Grand Jury proceeding and that police never conducted another interview of plaintiff after he was released from the hospital.

65.     ADA Mahoney approved and consented to the continued prosecution of plaintiff by ADA Gunther.

66.     DA Vance or one of his designees, knew or should have known, of the continued prosecution of plaintiff, and consented to it, and ratified said prosecution.

67.     The decision to continue to prosecute plaintiff was made with deliberate and reckless disregard for plaintiff's protected civil and constitutional rights.

68.     A review of the court file shows that the arrest warrant was vacated and adjourned until July 1, 2013, Part 61 for plaintiff to be arraigned. On July 1, 2013 the case was calendared in Part 61 before the Honorable Judge Bonnie Wittner presiding. The case was adjourned until July 2, 2013 when plaintiff was assigned 18B counsel.

69.     On July 2, 2013 the case was calendared in Part 61, plaintiff was assigned 18B Counsel Leslie Jones Thomas. Plaintiff was arraigned, pled not guilty and the People requested fifteen thousand ($15,000.00) dollars bail. Judge Wittner released plaintiff on his own recognizance. A motion schedule was set and the case was adjourned for decision on the motions for September 12, 2013.

70.     Plaintiff had been detained and imprisoned for five (5) days until the point when he was released from the court.

71.     Plaintiff's case was calendared for the following days: September 12, 2013, October 17, 2013, November 19, 2013, January 9, 2014, February 3, 2014, February 24, 2014, March 26, 2014, May 5, 2014, May 27, 2014, June 11, 2014 and on September 18, 2014 the indictment was dismissed by Judge Wittner pursuant to New York Criminal Procedure Law Section 30.30 for Speedy Trial violation. Accordingly, plaintiff was forced to come back and forth to court on the above dates for over one year, since his arrest on the indictment.

72.     From the date of the alleged assault incident on June 10, 2010 until plaintiff was arrested on July 1, 2013 he received no notices, letters or communications from DANY or the NYPD that he had been indicted and a warrant was out for his arrest.

73.     At the time of the incident and at all relevant times thereafter, plaintiff resided at 350 St. Anns Avenue, Bronx, New York with his mother Enid Rosado and father, Porfilo Melendez. A review of the police reports provided by the People indicates that the police had plaintiff's girlfriend's (Amilee Ripole) contact information. Ms. Ripole is the mother of plaintiff's children. The St. Anns address is where plaintiff resides and receives his mail, and is also the address listed on his driver's license. At no

time did plaintiff receive notification that he was wanted in connection with an indictment.

74.     Moreover, plaintiff was denied the opportunity to have knowledge about what happened to his attackers, he would have objected to their lenient sentencing, however, he was not notified of their sentencing date, nor given an opportunity to speak at their sentencing.  Hence, plaintiff was disfigured by his attackers, indicted and prosecuted based upon their statements, not given an opportunity to defend himself before the Grand Jury, and not permitted to know what happened to his attackers.

## LIABILITY OF THE INDIVIDUAL DEFENDANTS

75.     All of the acts described above were committed by the individual defendants under color of state law and under their respective authorities as police officers and prosecutors, supervisors, and employees, acting within the scope of their employment.

76.     The individual defendants, in committing the aforesaid conspiracies, acts, and omissions to act, were deliberately indifferent to, and in reckless disregard of plaintiff's rights, and thereby caused actual injuries to plaintiff.

77.     The defendants, in committing the aforesaid acts, were acting as joint tortfeasors.

78.     As a direct and proximate result of the conspiracies, acts and omissions to act described above, the individual defendants subjected the plaintiff to loss of liberty and other deprivations of constitutional rights, including, but not limited to, deprivation of the right to substantive due process, pain and suffering, severe and permanent emotional injuries, mental anguish as well as other psychological injuries, extreme emotional

distress, shame, humiliation, indignity, damage to reputation and obliged plaintiff to pay for attorney expenses.

### A.   MUNICIPAL LIABILITY

#### 1.   For the Actions of the Police Defendants Pursuant to Policies and Practices In Existence at the Time of This Action

79.   All of the acts by the police defendants described above were carried out pursuant to policies and practices of the City of New York which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant City and its agency, the NYPD.

80.   Defendant City and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the police defendants' wrongful acts; and/or failed to prevent or stop these acts; and/or allowed or encouraged these acts to continue.

81.   The actions of the police defendants resulted from or were taken pursuant to *de facto* policies and/or well settled and widespread customs and practices of the City, which are implemented by police officers, to prosecute and continue to prosecute persons through fabricated and manipulated allegations without adequate basis in fact and/or despite substantial exculpatory evidence known to them and withheld from accused persons.

82.    The existence of such unlawful *de facto* policies and/or well–settled and widespread customs and practices has been known to supervisory and policy–making officers and officials of the NYPD and the City, including, without limitation, Chief Fox, Captain Donohue, and defendants Singer and Sepulveda, the supervising defendants

-19-

named in this complaint, and their predecessors in interest, for a substantial period of time.

83.     Despite knowledge of such unlawful *de facto* policies and practices, these supervisory and policy-making officers and officials of the NYPD and the City and their predecessors in interest did not take steps to terminate these policies and practices, did not discipline individuals who engaged in such practices, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, customs and practices through their deliberate indifference to or reckless disregard of the effect of said policies, customs and practices upon the constitutional rights of persons in the City of New York.

84.      The City's policies and practices in existence at the time of the conduct complained of herein, which caused the plaintiff's injuries herein include, *inter alia*, the following:

a. The failure to properly supervise, train, instruct, and discipline police officers with regard to proper conduct and investigation at and in relation to a crime scene;

b. The failure to properly supervise, train, instruct, and discipline police officers with regard to the preparation of truthful accusatory instruments;

c.      The failure to train, supervise, instruct and discipline police officers with regard to cross-complaints and sufficient probable cause for prosecution.

d. The failure to properly supervise, train, instruct, and discipline police officers with regard to adequate evidence of crimes and to discipline those who unjustifiably charged and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

e. The failure to properly supervise, train, instruct, and discipline police officers with regard to the exercise of their authority, including, without limitation, in regard to disclosure of exculpatory evidence;

f. The failure to properly supervise, train, instruct, and discipline police officers with regard to proper methods of conducting interviews of witnesses and/ or accused persons;

g. Encouraging and/ or failing to discipline officers for "testilying" and/ or fabricating false evidence to bring about the police officers' preconceived perceptions or determinations of guilt, including, but not limited to, such perceptions and/ or determinations influenced by racial prejudice and/ or ethnic bias.

85.     The aforementioned City policies, practices and customs of failing to supervise, train, instruct and discipline police officers and encourage their misconduct as evidenced by the police misconduct detailed herein.

86.     The City policies, practices and customs in existence at the time of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are further evidenced, *inter alia*, by the following:

a.     The Report of the Commission to Investigate Allegations of Police Corruption and the Anti- Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors.

Corrupt and honest officers told us that their supervisors knew or should
have known about falsified versions of searches and arrests and never
questioned them. What breeds this tolerance is a deep- rooted perception
among many officers of all ranks within the Department that nothing is
wrong with the compromising facts to fight crime in the real world.
Simply put, despite the devastating consequences of police falsifications,
there is a persistent belief among many officers that it is necessary and
justified, even if unlawful. As one dedicated officer puts it, police officers
often view falsifications as, to use his words, "doing God's work" – doing
whatever it takes to get a suspected criminal off the streets. This attitude is
so entrenched, especially in high- crime precincts, that when investigators
confronted one recently arrested officer with the evidence of perjury, he
asked in his disbelief, "What's wrong with that? They're guilty."

Mollen Commission Report, p. 36, 40-41.

b. Since at least 1984, defendant City and the NYPD have been on notice that
their training of police officers has been inadequate and that police officers joining the
force, including, on information and disbelief, individual defendant police officers herein,
were disproportionately involved in misconduct and abuse. See, e.g., Mayor's Advisory
Committee on Police Management and Personnel Policy, Final Report, February 24,
1987.

c. The City of New York Office of the Comptroller, in an unpublished report,
found that the police often conduct inadequate investigations.

d. Damages have been awarded to victims of police misconduct in 300-400 cases annually since 1988, as a result of out- of- court settlements or judgements in civil actions.

e. The money paid out by the City in damages to alleged victims of police misconduct rose from approximately $7 million in 1988, to $13.5 million in 1992, to $24 million in 1994.

f. More than $82 million was paid in damages to victims of police misconduct in 1352 cases between 1992 and 1995.

g. In the vast majority of police misconduct cases that result in verdicts or substantial settlements for the victims, Defendant City imposes no discipline, either before or after resolution in court, also never reopens an investigation previously conducted after such resolution, and sometimes promotes the abusive officer to a position of greater authority despite the judicial resolution.

h.  Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that in the NYPD there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully.

i. In 1985, former Police Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD.

j. Former New York Police Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

87.    Upon information and belief, police officers receive inadequate training regarding how to conduct interrogations of young people and, in fact, are indoctrinated in the use of isolation, false promises, threats, and intimidation.

-23-

88.     Upon information and belief, defendant City and its agency, the NYPD, failed to effectively screen, hire, train, supervise and discipline their police officers, including the defendant police officers herein, for racial bias, lack of truthfulness, and for their failure to protect citizens from the unconstitutional conduct of other police officers, thereby permitting and allowing the defendant police officers to be in a position to unlawfully accuse the plaintiff herein, not provide the plaintiff with notice of a grand jury proceeding regarding him, withhold exculpatory evidence to secure a grand jury indictment against the plaintiff in violation of federal and state constitutional rights, and/or to permit these actions to take place with those officers' knowledge or consent.

89.     On information and disbelief, the defendant police officers herein may have been the subject of prior civilian and departmental complaints of misconduct that gave notice to, or should have given notice to defendant City and its agency, the NYPD, that the defendant police officers herein were likely to engage in conduct that would violate the civil and constitutional rights of the public, such as the conduct complained of by the plaintiff herein.

90.     The plaintiff's injuries were a direct and proximate result of the defendants' wrongful policies, practices, customs and/ or usages complained of herein and in existence at the time of the incidents complained of herein and of the knowing and repeated failure of the defendant City and the NYPD to properly supervise, train and discipline their police officers.

91.     Defendant City knew or should have known that the acts alleged herein would deprive plaintiff of his rights, in violation of the Fourth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitutions and Article 1 §§ 1, 6, 11, 12

of the Constitution of the State of New York, including, without limitation, freedom

from deprivation of liberty without due process of law.

92.      The defendant City is directly liable and responsible for the acts of the

defendant officers because it repeatedly and knowingly failed to properly supervise,

train, instruct, and discipline them and because it repeatedly and knowingly failed to

enforce the rules and regulations of the NYPD, and to require compliance with the

constitutions and laws of the State of New York and the United States.

93.      The defendant City is also directly liable and responsible for the acts of

the individual police defendant for state law claims under the doctrine of respondent

superior.

### 2.      For the Actions of the Prosecutors Pursuant to the Policies and Practices in Existence at the Time of the Case

94.      All of the acts by the defendant prosecutors described above were carried

out pursuant to policies and practices of the City of New York which were in existence at

the time of the conduct alleged herein and were engaged in with the full knowledge,

consent, and under the supervisory authority of the New York County District Attorney's

Office.

95.      Defendant City and District Attorney's Office, by their policy-making

agents, servants and employees, authorized, sanctioned and/ or ratified the defendant

prosecutors' wrongful acts; and/ or failed to prevent or stop these acts; and/ or allowed or

encouraged these acts to continue.

96.      The actions of the defendant prosecutors resulted from and were taken

pursuant to *de facto* policies and/ or well-settled and widespread customs and practices of

the City, which are implemented by prosecutors, to prosecute and continue to prosecute

persons through fabricated and manipulated allegations without adequate basis in fact

and/ or despite substantial exculpatory evidence known to them and withheld from accused persons.

97.     The existence of such unlawful *de facto* policies and/ or well-settled and widespread customs and practices that has been known to supervisory and policy-making officers and officials of the District Attorney's Office and the City, including, without limitation, DA Vance, defendant ADA Mahoney, and their predecessors in interest, for a substantial period of time.

98.     Despite knowledge of such unlawful *de facto* policies and practices, these supervisory and policy- making officials of the District Attorney's Office and the City and their predecessors in interest did not take steps to terminate these policies and practices, did not discipline individuals who engage in such practices, or otherwise properly train prosecutors with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, customs, and practices through their deliberate indifference to or reckless disregard of the effect of said policies, customs and practices upon the constitutional rights of persons in the City of New York.

99.     The City's policies and practices in existence at the time of the conduct complained of herein, which caused the plaintiff's injuries herein include, *inter alia*, the following:

        a.     The failure to properly supervise, train, instruct, and discipline prosecutors on the need to expose and produce exculpatory evidence.

        b.     The failure to properly supervise, train, instruct, and discipline prosecutors with regard to proper investigatory techniques and adequate evidence of

crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause.

          c.     The failure to train, supervise, instruct and discipline prosecutors with regard to cross-complaints and sufficient probable cause for prosecution.

        100.    The aforementioned City policies, practices and customs of failing to supervise, train, instruct and discipline prosecutors and encouraging their misconduct are evidenced by the lack of notification to the plaintiff of a grand jury proceeding against him, the non-production and concealment of exculpatory evidence favorable to the plaintiff, the inadequate investigation of the claims made against plaintiff, the failure not re-interview plaintiff, and the failure to interview witnesses at the scene of the crime. These failing policies and practices of DANY represent the reckless disregard of the constitutional rights and privileges of persons of African descent and ethnic bias.

        101.    The City policies, practices and customs in existence at the time of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are further evidenced, *inter alia*, by the Mollen Commission's conclusion that the same tolerance of perjury and falsifications that is exhibited among police officers is exhibited among prosecutors. The Commission specifically noted that "several former and current prosecutors acknowledged – 'off the record'- that perjury and falsifications are serious problems in law enforcement that, though not condoned, are ignored." Mollen Commission Report, p.42.

### 3.    For the Actions of the District Attorney

        102.    All of the acts by the defendant prosecutors described in the proceeding paragraphs were carried out with the actual or constructive knowledge, consent, acquiescence, ratification and/ or cooperation of the highest ranking members of the New

York County District Attorney Offices as well as District Attorney Cyrus R. Vance, Jr. ("DA Vance").

103.    DA Vance and his most senior management held regular meetings attended by Bureau Chiefs, including defendant Mahoney, to review facts relating to investigations, to authorize prosecutions and to discuss the status and progress of cases brought by that office.

104.    At meetings concerning the plaintiff's case, DA Vance and his most senior management were briefed as to the status of the case and determinations were made to authorize the prosecution and the continuing prosecution of the plaintiff herein.

105.    At these meeting, DA Vance and his most senior management were made well aware that defendants Mahoney, Lewis and Gunther were unconstitutionally and unlawfully prosecuting and continuing to prosecute the plaintiff herein based on manipulated allegations without adequate basis in facts and/ or despite substantial exculpatory evidence known to assistant district attorneys and police officers and withheld from the plaintiff herein.

106.    Nonetheless, DA Vance, either directly or by designating his authority and responsibility to others in a senior management or supervisory capacity, failed to adequately supervise defendants Mahoney, Lewis and Gunther or allowed the prosecution of the plaintiff to continue despite being informed of the inadequacy of the evidence, the exculpatory evidence, and the lack of notification to the plaintiff of the grand jury proceedings.

107.    Despite his knowledge of impropriety of the prosecution, DA Vance did not terminate this prosecution, did not discipline prosecutors who engage in unconstitutional and unlawful practices, and did not properly train or supervise these

prosecutors with regard to the constitutional and statutory limits on the exercise of their authority, and instead acquiesced and ratified the unconstitutional and unlawful practices in this case through his reckless and/ or deliberate indifference to the effect of said practices upon the constitutional rights of persons in the City of New York and the plaintiff herein.

108.    Without limiting the foregoing, DA Vance has specifically omitted to take the following steps to terminate the unconstitutional and unlawful practices:

a. The failure to properly supervise, train, instruct, and discipline prosecutors on the need to expose and produce exculpatory evidence.

b. The failure to properly supervise, train, instruct, and discipline prosecutors with regard to proper investigatory techniques and adequate evidence of crimes and to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause.

c.    The failure to train, supervise, instruct and discipline prosecutors with regard to cross-complaints and sufficient probable cause for prosecution.

109.    The defendant City is directly liable and responsible for the acts of DA Vance because of the repeated and knowing failure to properly supervise, train and discipline prosecutors and because of the professional and ethical obligations of prosecutors, and to require their compliance with the Constitutions and laws of the State of New York and the United States.

110.    The knowing and repeated failure of DA Vance to properly supervise, train and discipline the prosecutors in his Office actually caused the injuries to plaintiff alleged herein.

111.    Defendant City of New York knew or should have known that the acts and failures to act of DA Vance alleged herein would deprive plaintiff of his rights, in violation of the First, Fourth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitution and Article 1, §§ 1, 6, 11, and 12 of the Constitution of the State of New York, including, without limitation, freedom from deprivation of liberty without due process of law.

### B.    LIABILITY OF POLICE DEPARTMENT SUPERVISORS

112.    All of the acts by the police defendants involved with the investigation and prosecution of plaintiff were carried out with the actual or constructive knowledge, consent, acquiescence, ratification and/ or cooperation of the supervisory authority of former or current Chief of the Transit Bureau Joseph Fox ("Chief Fox"), former or current Manhattan High Alert Captain Donohue FNU ("Captain Donohue"), and defendants former or current Lieutenant Keith Singer and former or current Detective Alexander Sepulveda (collectively the "Supervisory Police Defendants").

113.    These Supervisory Police Defendants were well aware that police officers, including, without limitation, the individual detectives and sergeants involved in this case, unconstitutionally and unlawfully prosecute and continue to prosecute persons through fabricated and manipulated allegations without adequate basis in fact and/ or despite substantial exculpatory evidence known to police officers and withheld from accused persons.

114.    These Supervisory Police Defendants had not properly trained police officers with regard to constitutional and statutory limits on the exercise of their authority, and instead acquiesced and ratified these unconstitutional and unlawful

practices through their reckless and/or deliberate indifference to the effect of said practices upon the constitutional rights of persons in the City of New York.

115.     Without limiting the foregoing, the Supervisory Police Defendants, acting jointly and severally, did the following:

a. They failed to properly supervise, train, instruct and discipline police officers with regard to proper conduct and investigation at and in relation to a crime scene;

b. They failed to properly supervise, train, instruct, and discipline police officers with regard to the preparation of truthful accusatory instruments;

c.     The failure to train, supervise, instruct and discipline police officers with regard to cross-complaints and sufficient probable cause for prosecution.

d. They failed to properly supervise, train, instruct, and discipline police officers with regard to adequate evidence of crimes and have failed to discipline those who unjustifiably charge and prosecute or continue to prosecute persons accused of crimes in the absence of probable cause;

e. They failed to properly supervise, train, instruct, and discipline police officers with regard to the exercise of their authority, including, without limitation, in regard to disclosure of exculpatory evidence;

f. They failed to properly supervise, train, instruct, and discipline police officers with regard to proper methods of conducting interviews with witnesses and/or accused persons;

g. They encouraged and/ or failed to discipline officers for "testifying" and/ or fabricating false evidence to bring about the police officers' preconceived

perceptions or determinations of guilt, including, but not limited to, such perceptions and/ or determinations influenced by racial prejudice and/ or ethnic bias.

116.    The Supervisory Police Defendants are rendered directly liable and responsible for the acts of the defendant detectives and sergeants because the Supervisory Police Defendants repeatedly and knowingly failed to properly supervise, train and discipline police officers under their command and because the Supervisory Police Defendants repeatedly and knowingly failed to enforce the rules and regulations of the Police Department, and to require compliance with the Constitutions and laws of the State of New York and the United States.

117.    The knowing and repeated failure of the Supervisory Police Defendants to properly supervise, train and discipline officers under their command actually caused injuries to plaintiff alleged herein.

118.    The Supervisory Police Defendants knew or should have known that the acts alleged herein would deprive plaintiff of his rights, in violation of the Fourth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitution and Article 1 §§ 1, 6, 11, and 12 of the Constitution of the State of New York, including, without limitation, plaintiff's freedom from deprivation of liberty without due process of law.

119.    All of the foregoing acts and omissions were unlawful and unreasonable and contrary to law resulting in harm to plaintiff Melendez.

### FOR A FIRST CAUSE OF ACTION
**(Violation of Rights Secured by 42 U.S.C. Section 1981 and the Fourteenth Amendment to the United States Constitution)**

120. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 119 as if fully set forth herein.

121.    Defendants, acting under color of state law, subjected plaintiff who is Hispanic-American, to the foregoing conspiracies, unlawful acts and omissions, including, but not  limited to, malicious prosecutions, wrongful indictment and conspiracies not to produce exculpatory evidence to the grand jury and not to notify plaintiff of a grand jury presentment against him because of his race and ethnicity.

122.    Plaintiff white Hispanic-American/Puerto Rican descent and his two assailants Jordan Lake and Jovan Haulsey black African-Americans were the focus of the defendants' investigation and all were accused of assault and other crimes for the occurrence on June 10, 2010.

123.    Upon information and belief, defendants were white.

124.    Defendants' conspiracies, unlawful acts and omissions denied plaintiff equal rights under the law, including, but not limited to, plaintiff's right to the full equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white and non-Hispanic-American citizens and additionally were, instead, subjected to punishments, pains and penalties unlike those imposed upon white and non-Hispanic-American citizens.

125.    Defendants acted intentionally and purposefully, without lawful justification and with a reckless disregard for the natural and probable consequences of their acts, causing specific and serious bodily, mental and emotional harm, economic injury, pain and suffering in violation of plaintiff's Constitutional rights as guaranteed under 42 U.S.C. § 1981 and the Fourteenth Amendment to the United States Constitution.

**FOR A SECOND CAUSE OF ACTION**
**(Violation of Rights Secured by 42 U.S.C. § 1983 and the First, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution)**

126. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 119 as if fully set forth herein.

127.    Defendants, acting under color of state law, subjected plaintiff to the foregoing conspiracies, unlawful acts, and omissions without due process of law and in violation of 42 U.S.C. § 1983, thereby depriving plaintiff of rights, privileges and immunities secured by the Constitution and laws, including, but not limited to, those rights, privileges and immunities secured by the First, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights, privileges and immunities:

a.      Plaintiff was denied his constitutional right to Freedom of Speech

b.      Plaintiff was denied his constitutional right not to be deprived of liberty without due process of law;

c.      Plaintiff was denied his constitutional right to assistance of counsel;

d.      Plaintiff was denied his constitutional right to equal protection of the laws;

e.      Plaintiff was denied his right to constitutional substantive and procedural due process;

f.      Plaintiff was denied his constitutional right to be free from unlawful searches and seizures;

g.      Plaintiff was denied his constitutional right to due process because he was stigmatized and subjected to infringements because of the outstanding warrant for his arrest;

128.    To the extent that any of these constitutional deprivations require a showing of specific intent and/or motive, the individual defendants acted intentionally,

maliciously, with racially and ethnically discriminatory motives and/or with reckless disregard for the natural and probable consequences of their acts.

129.    Defendants' conspiracies, unlawful acts, and omissions, conducted without lawful justification, caused specific and serious bodily, mental and emotional harm, economic injury, pain and suffering in violation of plaintiff's Constitutional rights as guaranteed under 42 U.S.C. § 1983 and the First, Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution.

## FOR A THIRD CAUSE OF ACTION
**(Violation of Rights Secured by 42 U.S.C. §§ 1983 and 1985 (3) and the Fourteenth Amendment to the United States Constitution)**

130.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 119 as if fully set forth herein.

131.    Defendants Singer, Sepulveda, Lewis, Gunther and Mahoney with other investigatory supervisory and command personnel, together and under the color of law, reached an understanding, engaged in a course of conduct, and otherwise conspired among and between themselves to deprive the plaintiff of his Constitutional rights, and did deprive plaintiff of said rights, including, but not limited to, plaintiff's right to be free from malicious prosecutions and plaintiff's rights to access to the Courts as protected by the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

132.    Because such actions were done with knowledge and purpose of depriving plaintiff, who is Hispanic-American, of the equal protection of the laws and/or of equal privileges and immunities under the law, and with racial and ethnic animus toward the plaintiff, they also deprived plaintiff of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. §§ 1983 and 1985(3).

133.     In furtherance of these conspiracies, the defendants and others named above, together with their unsued co-conspirators, committed the overt acts set forth in the facts above, including, but not limited to, the malicious prosecution of plaintiff; defendants' reckless, unreasonable and knowing belief in the false minimized inculpatory statements concerning plaintiff by assailants Jovan Haulsey and Jordan Lake; the suppression of exonerating exculpatory evidence, including, but not limited to, the testimony of plaintiff before the Grand Jury, the video tape, the 911 tape recordings, plaintiff's written statement, the non-identification of plaintiff by his accusers Jovan Haulsey and Jordan Lake, the failure to re-interview plaintiff after he was released from the hospital, the failure to interview civilian and transit worker witnesses at the scene of the crime or at a later date, and the failure to properly investigate the statements of assailants Haulsey and Lake.

134.     Said conspiracies and overt acts were continuing in nature, and caused plaintiff's constitutional violations and injuries, pain, suffering, fear, mental anguish, detention, defamation of character, and reputation and loss of freedom as set forth more fully above.

### FOR A FOURTH CAUSE OF ACTION
**(42 U.S.C. § 1983 *Monell* Claim Against the City of New York for the Actions and Omissions of the Police Officer Defendants and the Police Department)**

135. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 119 as if fully set forth herein.

136.     The City of New York through its Police Department had in effect, both before and the time of the events alleged in this complaint, several interrelated *de facto* policies, practices and customs, including, *inter alia,*

-36-

a.      a policy practice and custom of suppressing, destroying or otherwise secreting from criminal defendants exculpatory or exonerating evidence; and

b.      a policy practice and custom of failing to properly train or supervise officers in the proper techniques of investigating serious crimes;

c.      The failure to train, supervise, instruct and discipline police officers with regard to cross-complaints and sufficient probable cause for prosecution.

d.      a policy practice and custom of failing to properly discipline officers who violate the United States Constitution or law, or otherwise transgress the rights of criminal suspects during their investigations.

137.    These interrelated policies, practices and customs, separately and/or together, were implemented with deliberate indifference, and were a direct and proximate cause plaintiff's Constitutional violations as set forth above.

138.    These interrelated policies, practices and customs, separately and/or together, were the direct and proximate cause of injury and damage to plaintiff and violated his rights as guaranteed by the United States Constitutional, as well as his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

139.    The existence of these interrelated policies, practices and customs can be inferred from numerous incidents reflecting a pattern of police and prosecutor misconduct like that alleged herein.

**FOR A FIFTH CAUSE OF ACTION**
**(42 U.S.C. § 1983 *Monell* Claim Against the City of New York for the Actions and Omissions of Defendant Prosecutors and the District Attorney's Office)**

140. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 119 as if fully set forth herein.

141.     The City of New York through the New York County District Attorney's Office and its District Attorney's, had in effect, both before and the time of the events alleged in this complaint, at least two interrelated *de facto* policies, practices and customs, including, *inter alia,*

a.     The failure to properly supervise, train, instruct, and discipline prosecutors with regard to proper investigatory techniques and adequate evidence of crimes and to discipline those who unjustifiable prosecute or continue to prosecute persons accused of crimes in the absence of probable cause.

b.     The failure to properly supervise, train, instruct, and discipline prosecutors who conspire with police officers to conceal or not to produce evidence favorable to persons accused of crimes.

c.     The failure to train, supervise, instruct and discipline prosecutors with regard to cross-complaints and sufficient probable cause for prosecution.

142.     These interrelated policies, practices and customs, separately, and/or together, were implemented with deliberate indifference and were a direct and proximate cause of the plaintiff's Constitutional violations and injuries, as set forth above.

143.     These interrelated policies, practices and customs, separately and/or together, were the direct and proximate cause of injury and damage to plaintiff and violated his rights as guaranteed by the United States Constitutional, as well as his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

144.     The existence of these interrelated policies, practices and customs can be inferred from numerous incidents reflecting a pattern of police and prosecutor misconduct like that alleged herein.

145.     The existence of these interrelated policies, practices and customs can be inferred from the fact that the incidents of police and prosecutor misconduct alleged herein were authorized and not terminated by individuals from the New York County District Attorney's Office with municipal policy making authority.

146.     All of the acts by the defendant prosecutors described in the preceding paragraphs were carried out with the actual or constructive knowledge, consent acquiescence, ratification and/or cooperation of the highest ranking members of the New York County District Attorney's Office, including, but not limited to, D.A. Vance.

147.     DA Vance, as New York County District Attorney, is, by operation of state law and as a matter of fact, the final decision-maker for New York with regard to the investigative, arrest, custodial, prosecutorial and administrative acts, omissions, and decisions which he made or participated in, as alleged above.

148.     As a member of the District Attorney's Office with municipal policy making authority, DA Vance's ratification of said prosecutor misconduct is sufficient to infer a policy or custom of ratifying prosecutor misconduct by the City.

149.     These acts and omissions by DA Vance directly or proximately caused the constitutional violations and injury to plaintiff, and are directly chargeable to the defendant City of New York because of DA Vance's status as final decision-maker for the City with respect to matters involving the New York County District Attorney's Office.

## FOR A SIXTH CAUSE OF ACTION
### (Violation of Rights Under State Law)

150. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 119 as if fully set forth herein.

151.    By the actions described above, each and all of the defendants, jointly and severally, have committed the following wrongful acts against the plaintiff, which are tortious under the laws of the State of New York:

        a.    malicious prosecution;

        b.    intentional infliction of emotional distress upon the plaintiff in that the defendants intended to and did cause the plaintiff severe emotional distress through a continuous course of misconduct culminating in the plaintiff's indictment, arrests and prosecution for crimes that he did not commit.

        c.    defendants' acts were outrageous in the extreme and utterly unacceptable in a civilized society;

        d.    violation of other rights otherwise guaranteed to the plaintiff under the laws and/Constitution of the State of New York.

152.    The foregoing acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed to him by the laws and Constitution of the State off New York.

**FOR A SEVENTH CAUSE OF ACTION**
**(Respondeat Superior Against the City of New York)**

153.    Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 110 as if fully set forth herein.

154.    The individual defendants, and other individuals who joined with them in their wrongful conduct, were, at all times relevant to this Count, employees and agents of either the City of New York or the New York County District Attorney's Office. Each of those defendants and persons was acting within the scope of his or her employment, and their acts and omissions, as alleged above, are therefore, directly chargeable to the City of New York under the state law doctrine of *respondeat superior*.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands the following relief jointly and severally against all of the defendants, except that the punitive damages demand, is not, as a matter of law, recoverable against a municipality and therefore are not made against the City of New York:

1.    Compensatory and punitive damages awards, each in separate amounts of $5,000,000.00 or such greater amounts as may be set by a jury for plaintiff.

2.    A court order pursuant to 42 U.S.C. § 1988, that plaintiff is entitled to the cost involved in maintaining this action and attorney's fees;

3.    Such other and further relief as this court may deem just and proper.

## DEMAND FOR A JURY TRIAL

A jury trial is hereby demanded on each and every count of the causes of action as pled herein.

New York, New York
February 26, 2016

_____
Gregory G. Smith (GS-9900)
Attorney for Plaintiffs
225 Broadway, Suite 3601
New York, New York 10007

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**          Index No:
**SOUTHERN DISTRICT OF NEW YORK** _____

JASON MELENDEZ,

                              Plaintiff,

        -against-

THE CITY OF NEW YORK, CHIEF JOSEPH FOX, CAPTAIN
DONOHUE FNU, LIEUTENANT KEITH SINGER, DETECTIVE
ALEXANDER SEPULVEDA, ADA JUDITH LEWIS, ADA ALYSSA
GUNTHER, ADA WILLIAM MAHONEY,

                              Defendants.

---

## COMPLAINT

---

**GREGORY G. SMITH, ESQ.**
*Attorney for the Plaintiff*
**225 Broadway, Suite 3601**
**New York, New York 10007**
**PHONE: (212) 267-2042**

To Attorney(s) for the People:

_____

Service of a copy of the within is hereby admitted.

Dated:
              _____

*Attorneys for*